UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————

UNITED STATES OF AMERICA,

        v.

TENG SUN,

             Defendant.

———————————————————

**DECISION AND ORDER**

1:19-CR-00135 EAW

Pending before the Court are objections filed by the government to a Report and Recommendation issued by United States Magistrate Judge Jeremiah J. McCarthy, granting the motion to suppress physical evidence and statements filed by defendant Teng Sun ("Sun"). (*See* Dkt. 76 (Report and Recommendation); Dkt. 79 (Objections)). Familiarity with the Report and Recommendation is assumed for purposes of this Decision and Order.

The Court has conducted a thorough review of the Report and Recommendation, the parties' filings before this Court and Judge McCarthy, and the transcripts from the evidentiary hearing conducted before Judge McCarthy. In addition, the Court has considered the arguments advanced by counsel at the oral argument held before the undersigned on September 17, 2021. After a *de novo* review of the issues for which objections were filed, and after a thorough consideration of the issues raised in Sun's suppression motion[1], the Court hereby accepts the Report and Recommendation in part.

---

[1] In connection with the briefing on his suppression motion, Sun argued that his arrest at the Royalton Town Court was unlawful, and therefore the search of his home was fruit of the unlawful arrest and required suppression. (Dkt. 72 at 13). Judge McCarthy did not

Specifically, the Court agrees with Judge McCarthy's conclusion that the government failed to carry its burden that Sun was properly mirandized, and therefore his statements must be suppressed.   However, as further explained below, because the Court finds that further factfinding is required before it can render a decision with respect to Sun's consent to search his home, the matter is referred back to Judge McCarthy for further proceedings consistent with this Decision and Order.

## BACKGROUND

### I.   Procedural History

Sun is charged in a one-count indictment as an illegal alien in possession of firearms and ammunition, in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2).  (Dkt. 12).  The charges stem from his alleged possession of several firearms and ammunition seized from his home on March 14, 2019.  (*Id*.; *see also* Dkt. 76 at 1).  The Court referred all pretrial matters in the case to Judge McCarthy, pursuant to 28 U.S.C. § 636(b)(1)(A)-(B).  (Dkt. 14).

Sun filed pretrial motions on February 23, 2020.  (Dkt. 29).  As part of his pretrial motions, Sun filed a motion to suppress physical evidence seized from his home and statements he made on March 14, 2019, along with a supporting affidavit.  (*Id*. at ¶¶ 67-89; Dkt. 32).  Sun argued that the search of his home was unlawful because there was no warrant and his consent to search—which was obtained after the search was already

---

address this argument in the Report and Recommendation, but also noted that although Sun's motion to suppress sought other forms of relief, at oral argument his attorney confirmed those issues had been resolved.  (Dkt. 76 at 1 n.2).

conducted—was coerced.  (Dkt. 29 at ¶ 88).  Further, Sun argued his statements to law enforcement were made when he was "in custody, represented by counsel and never mirandized."  (*Id.* at ¶ 89); *see also Miranda v. Arizona*, 384 U.S. 436 (1966).

The government filed response papers on March 4, 2020.  (Dkt. 30).  An evidentiary hearing was held on June 15, 2020 and March 30, 2021, where Judge McCarthy heard testimony from U.S. Immigration and Customs ("ICE") Supervisory Detention and Deportation Officers ("SDDO") Frank Farkas ("SDDO Farkas") and Lisa Corsi ("SDDO Corsi"), Sun's former attorney Dominic H. Saraceno, and Sun himself.[2]  (Dkt. 66; Dkt. 70; *see also* Dkt. 76 at 1).  After receiving post-hearing briefing from the parties (Dkt. 71; Dkt. 72; Dkt. 73; Dkt. 74), Judge McCarthy held oral argument on the motion (Dkt. 75).  On July 1, 2021, Judge McCarthy issued a Report and Recommendation, recommending that the undersigned grant Sun's motion to suppress.  (Dkt. 76).

The government filed objections to the Report and Recommendation on July 29, 2021 (Dkt. 79), and Sun filed a response on August 16, 2021 (Dkt. 81).  The Court held oral argument on September 17, 2021, and reserved decision.  (Dkt. 83; Dkt. 84).

---

[2]     Sun was originally represented in this federal case by Mr. Saraceno.  (Dkt. 2). However, during SDDO Corsi's testimony at the evidentiary hearing, Mr. Saraceno stated that he was present with Sun when he was taken into custody by the immigration officers and "might have to testify to contradict" the testimony by SDDO Corsi.  (Dkt. 70 at 32, 34).  Accordingly, the evidentiary hearing was continued from June 15, 2020 until March 30, 2021, and Sun obtained a new attorney to represent him in connection with this case. (Dkt. 45; Dkt. 66).

## II.    <u>**Evidentiary Hearing Testimony**</u>

SDDO Corsi testified that Sun was detained on March 14, 2019, at the Royalton Town Court for being a student out of status, meaning he had overstayed his student visa. (Dkt. 70 at 30-31).  She encountered Sun in the courthouse parking lot along with four or five additional agents.  (Dkt. 66 at 15-16).  Sun had been at the courthouse on a gun charge, and his lawyer was present when he was taken into custody.  (Dkt. 70 at 30-31).  Sun's wife, who was also out of status and being taken into custody, was present in the parking lot in a vehicle.  (*Id*. at 32).  SDDO Corsi testified that her partner, Officer Sukmanowski, spoke with Sun's attorney and explained that the officers had an administrative warrant and were taking Sun into custody.  (Dkt. 66 at 17).  Sun had his passport, but his wife did not have her passport, which was back at their residence.  (*Id*.; Dkt. 70 at 32).  SDDO Corsi spoke to Sun's wife, and testified that it was their "intention . . . to take his wife back to the house to retrieve her passport," but that "[Sun] stated that he preferred to go."  (Dkt. 66 at 17).  SDDO Corsi testified that she did not hear Sun consent to entry into the home to retrieve the passport in the courthouse parking lot, but that he "consented to Officer Sukmanowski, as far as [she] recall[ed]," and that although Sun's wife did not consent to the officers entering the home, she was willing to go there with the officers to retrieve her passport, and further explained that "once we have someone in custody . . . they stay in our care, custody, and control."  (*Id*. at 21-22).  Sun's wife was transported to a detention facility in Batavia, and SDDO Corsi and two other officers transported Sun back to his home to retrieve the passport.  (*Id*. at 6).

While en route, the officers had some discussions with Sun, including taking his biographical information.  (*Id*.).  SDDO Corsi also answered Sun's questions regarding joining the military.  (*Id*. at 8).  As they approached Sun's home, SDDO Corsi asked "the standard questions," including "if there were any other persons in the home; if there were any animals; if there was anything in the home that would . . . hurt us, or potentially hurt us."  (*Id*.).  Sun responded that he had firearms in the home.  (*Id*. at 9).  SDDO Corsi testified that she knew Sun was charged with gun possession in Royalton and she knew it was illegal for him to have firearms, but she did not mirandize him before asking him these questions:

> Q.   And—so you were asking—you knew that he was charged with gun possession in Royalton, correct?
>
> A.   Correct.
>
> Q.   And you knew it was illegal for him to have firearms, correct, because he was—overstayed his visa?
>
> A.   Correct.
>
> Q.   And yet you asked him about guns?
>
> A.   Correct.
>
> Q.   Did you Mirandize him before you asked him a statement that could incriminate himself?
>
> A.   I believe he was Mirandized before we pulled out of the parking lot of the courthouse in Royalton, by my partner, Officer Sukmanowski.

(*Id*. at 12-13).  However, none of the documentation reflects that Sun was mirandized.  (*Id*. at 13, 25).  SDDO Corsi testified that her questions were not meant to be investigative, but rather for "officer safety."  (*Id*. at 33).

- 5 -

SDDO Corsi testified that when the officers were escorting Sun into the home, they explained to him that they were going to accompany him into the residence "only to obtain the passport," to which Sun had no objection. (*Id*. at 27). SDDO Corsi did not initially accompany Sun into the home but was brought in when officers in the home with Sun wanted her to witness Sun's signing a consent to search form. (*Id*. at 9). SDDO Corsi explained that although Sun was not comfortable signing the standard ICE consent form, he was willing to sign a consent form he authored. (*Id*. at 9). SDDO Corsi also testified that she observed different components and gun paraphernalia "all over the kitchen." (*Id*. at 28). After signing the form, SDDO Corsi went back to her vehicle. (*Id*. at 29). Although the officers searched the detached garage to the residence, consent to search the garage was not specified on the consent to search form. (*Id*. at 31).

SDDO Farkas testified that he met Sun and SDDO Corsi at Sun's residence, which was located at 65634 Sheridan Drive in Williamsville, New York. (Dkt. 70 at 7-8, 30). SDDO Farkas introduced himself when he encountered Sun and asked if they were going to get the passport, to which Sun responded "yes." (*Id*. at 22). He did not recall Sun asking if he could get the passport himself, but noted that had Sun asked that question, "we wouldn't have done that anyway." (*Id*. at 21). Sun was not mirandized at this time. (*Id*.). SDDO Farkas found Sun's consent to enter the home "based on us escorting [him] into the house." (*Id*.). Inside the residence, SDDO Farkas observed "two large storage cases," or "pelican cases, which are used to store weapons or weapon parts, as well as small cardboard boxes on top of them, which clearly had weapons parts in them." (*Id*. at 9). SDDO Farkas testified that Sun was not mirandized prior to his observing the pelican cases, but he did

mirandize him after seeing the pelican cases, as he "wanted to question him to being an alien out of status in possession . . . of firearms." (*Id*.). SDDO Farkas testified to the following as to Sun's *Miranda* rights:

> It basically says that he doesn't have to answer our questions. He does it free—free and willing. He has the right to an attorney. If he can't afford one, one will be provided for him. And at the end, most importantly, we ask him, do you understand your rights. In which he stated, yes.

(*Id*. at 28).

SDDO Farkas asked Sun if he had firearms in his home, to which Sun replied that he did. (*Id*. at 10). SDDO Farkas then presented Sun with a blanket consent to search form that ICE utilizes; Sun did not feel comfortable consenting to the full search of his home, but he signed a consent form permitting the agents to search his residence for the firearms only. (*Id*. at 9-13, 25). SDDO Farkas stated that it took Sun "maybe 20 minutes, half hour" to draft his own form. (*Id*. at 26). Sun took the officers room to room, showing them where the firearms and paraphernalia were located. (*Id*. at 13). Four officers were engaged in the search of the house. (*Id*. at 27). The officers recovered firearms and ammunition from the detached garage as well. (*Id*. at 13).

Mr. Saraceno testified that he was at Royalton Town Court on the evening on March 14, 2019, representing Sun in connection with a firearm charge. (Dkt. 66 at 37). He had previously learned that officers were present at the courthouse to arrest Sun because he was told by the chief in the Town of Royalton. (*Id*.). Mr. Saraceno encountered five or six officers in the parking lot when he exited the Royalton courthouse, and the officers informed him that they were taking Sun into custody. (*Id*. at 37-38). Mr. Saraceno

introduced himself to the officers as Sun's attorney.  (*Id*. at 38, 40).  The officers asked Sun and his wife if they had their passports, and upon discovering that his wife did not have her passport, told them that it would "make things go a lot more smoothly" if they could go back to the house and obtain the passport.  (*Id*. at 38).

Mr. Saraceno testified that he "said to Teng and his wife: Don't talk about the case. Just go back and get the passport, and then call me when you get to Batavia."  (*Id*.; *see also id*. at 42 (Mr. Saraceno testifying that he "said, collectively . . . to Teng and his wife, and in front of the agents—they are just going to take you back to the house to get . . . Mrs. Sun's ID.  And you are not to talk about anything, call me when you get back to Batavia."); *id*. (Mr. Saraceno clarifying that when he said "anything," he meant "anything of substance . . . he was represented by an attorney.  They shouldn't have been talking to him about anything"); *id*. at 43 (Mr. Saraceno testifying that, for instance, he "didn't want [the officers] negotiating a consent to search [Sun's] house")).  The officers told Mr. Saraceno that they "just need[ed] [Sun's] wife's passport."  (*Id*. at 39).  Mr. Saraceno observed Sun give the officers his passport, along with what looked like "a credit card holder or something," that contained documents Sun also gave to the officers.  (*Id*. at 39-40).  Mr. Saraceno further testified that he assumed the officers would take Sun's wife back to the residence as it was her passport that was missing, and Sun did not say in his presence that he was willing to go back to his home, or otherwise consent to the officers going into the home to retrieve the passport.  (*Id*. at 39).

Sun also testified at the hearing.  (*Id*. at 49).  He testified that the officers asked him about firearms on the ride to his home when they were going through his documents and

saw his hunting license, which was with the passport. (*Id*. at 49-50). One of the officers asked Sun if he had firearms, to which Sun responded "yes." (*Id*. at 50). Sun testified that he was not mirandized at that time. (*Id*.). Sun was asked to sign a consent form at his house which he refused, but he did sign a different consent form which one of the officers drafted. (*Id*.). Sun testified that he signed this consent form "under coercion," and that the officers had "threatened . . . that they'd lock me up in prison for years," and that he would not see his family and wife "forever." (*Id*. at 51). Sun testified that the officers searched his home before he signed the consent to search form. (*Id*. at 52). The guns were on the first floor of his home, and his wife's passport was on the second floor. (*Id*.). Sun testified that he had two guns in his home, eight guns in his garage, and "a couple thousand" rounds of ammunition. (*Id*. at 52-53). Sun testified that, contrary to the officers' testimony, the firearm parts and paraphernalia were not directly visible upon entering his kitchen. (*Id*. at 54). Sun also disputed the officers' testimony that Sun drafted the consent form himself. (*See id*. ("that's not my handwriting, and they did not consult me—or they did not ask for my opinion of the wording of the consent")). Sun confirmed that the signature on the consent form was his own, but stated that he was threatened by the officers before signing it. (*Id*. at 54-55).

## **DISCUSSION**

Judge McCarthy concluded that Sun's statements relating to his possession of firearms should be suppressed because the government failed to demonstrate that Sun was properly mirandized. (Dkt. 76 at 5). Judge McCarthy further found that evidence recovered from Sun's residence and garage should be suppressed because the search was

tainted by the illegally obtained statements.  (*Id.* at 7).   The government makes five arguments as to why the Court should decline to adopt the Report and Recommendation, including: (1) Sun's statements that there were firearms in his residence were lawfully obtained pursuant to the "officer safety" exception to *Miranda*; (2) the Magistrate Judge erred in suppressing the firearms seized from Sun's home because his consent to search was sufficient; (3) the Magistrate Judge overlooked important facts in making his credibility determinations; (4) the Magistrate Judge erred in suppressing the firearms seized from Sun's home because the *Miranda* warnings given to him were sufficient; and (5) coupled with Sun's implied consent for the officers to be in his home, the observation of the pelican cases and boxes of gun parts in plain sight means that the items located in the cases and boxes would have been inevitably discovered.[3]   (Dkt. 79 at 9-24).   The government's first argument—that the questions posed to Sun regarding any items in his home that could harm the officers were made to ensure officer safety, rather than in connection with any custodial interrogation—was not raised before Judge McCarthy.

## I.   <u>Legal Standard</u>

A district court reviews any specific objections to a report and recommendation on a dispositive issue, such as a motion to suppress, under a *de novo* standard.  Fed. R. Crim. P. 59(b)(3); *see also* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo

---

[3]     The first page of the government's objections states that "the Government respectfully requests the Court decline to adopt Judge McCarthy's R&R related to the physical evidence seized on March 14, 2019[.]"   (Dkt. 79 at 1).   At oral argument before the undersigned, counsel for the government clarified that was a misprint and that the government also meant to challenge the Report and Recommendation insofar as it recommended suppression of Sun's statements to law enforcement.

determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). To trigger the *de novo* review standard, objections to a report and recommendation "must be specific and clearly aimed at particular findings in the magistrate judge's proposal." *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). Moreover, "it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not." *United States v. Gladden*, 394 F. Supp. 3d 465, 480 (S.D.N.Y. 2019) (quoting *Hubbard v. Kelley*, 752 F. Supp. 2d 311, 313 (W.D.N.Y. 2009)).

## II.    *Miranda* **and the Public Safety Exception**

"To protect the Fifth Amendment right against self-incrimination, the Supreme Court in *Miranda v. Arizona* ruled that police may not interrogate a suspect who has been taken into custody without first warning the person 'that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004) (quoting *Miranda*, 384 U.S. at 479). "If a suspect is not so warned, the prosecution is barred from using statements obtained during the interrogation to establish its case in chief." *Id*. "Where a defendant 'has alleged police custodial interrogation in the absence of *Miranda* warnings, the burden shifts to the government to prove *Miranda* voluntariness, either because there was no custodial interrogation implicating *Miranda,* there was some exception to the *Miranda* rule, or because [the defendant] was properly

*Mirandized* and waived his rights.'"  *United States v. Medina*, 19 F. Supp. 3d 518, 537 (S.D.N.Y. 2014) (alteration in original) (quoting *United States v. Miller,* 382 F. Supp. 2d 350, 362 (N.D.N.Y. 2005)).  "[A] technical deficiency in the administration of *Miranda* warnings is not in and of itself a violation of the Fifth Amendment," and "[t]his Circuit has recognized that '[i]t is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.'"  *United States v. Yousef*, 925 F. Supp. 1063, 1074 (S.D.N.Y. 1996) (third alteration in original) (quoting *United States v. Morales,* 788 F.2d 883, 886 (2d Cir. 1985)).  "The overall inquiry into whether a statement was voluntarily given . . . is to consider the totality of the circumstances of the interview to determine if the accused's will was somehow overborne by the agent's coercive conduct."  *Id*.

The Court agrees with Judge McCarthy's conclusion that the government has failed to carry its burden of showing that Sun was properly mirandized at the time he made statements relating to his possession of firearms.  The testimony at the hearing revealed that Sun admitted to possessing firearms both in the vehicle with SDDO Corsi on the way to his home, and again upon arrival at his home to SDDO Farkas.  The parties do not dispute that Sun was in custody during this time.  With regard to Sun's statements made in the car to SDDO Corsi, she testified that she did not mirandize Sun as she believed her partner, Officer Sukmanowski, had previously mirandized him at Royalton Town Court.  However, Officer Sukmanowski did not testify at the hearing, nor did any of the reports from Sun's

- 12 -

arrest on March 14, 2019 reflect that he had been mirandized prior to making statements to SDDO Corsi.  SDDO Corsi's statement that she "believed" Sun was mirandized by Officer Sukmanowski is insufficient for the government to meet its burden.  *United States v. Seldinas*, No. 12-CR-111, 2015 WL 1823532, at *5 (W.D.N.Y. Apr. 22, 2015) ("Without any testimony as to what rights were told to defendant, or testimony that the officer relied on a pre-printed form or card, the Court has no basis upon which to conclude that defendant was given the proper warnings.").

Turning to Sun's statements made inside his home, SDDO Farkas testified that he mirandized Sun after he had entered Sun's home and observed the firearms paraphernalia in the kitchen.  When SDDO Farkas was asked to expound upon what is encompassed in a defendant's *Miranda* rights, SDDO Farkas mentioned the right to remain silent and the right to an attorney.  However, he failed to include the warning that anything said "can and will be used against [him] in court."  *Miranda*, 384 U.S. at 469 ("The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court."); *see also United States v. Pritchette*, 219 F. Supp. 3d 379, 383 (S.D.N.Y. 2016) ("In light of the inherently coercive nature of police custody, and in order to safeguard these Fifth Amendment rights, individuals questioned in custody must be told that they have the right to remain silent, *that anything they say may be used against them in court*, that they are entitled to the presence of an attorney during questioning, and if they cannot afford an attorney, one will be provided." (emphasis added) (citation omitted)).  As explained in *Miranda*, the warning that anything the defendant says can be used against him "is needed in order to make him aware not only of the privilege,

but also of the consequences of forgoing it.  It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege.  Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest." *Miranda*, 384 U.S. at 469; *cf. Yousef*, 925 F. Supp. at 1075 (although original *Miranda* warnings lacked the warning that defendant's statements could be used against him in court, deficiency was not so egregious to require suppression of statement taken later by another agent, after defendant was fully advised of his rights).  Accordingly, the Court agrees with Judge McCarthy's conclusion that the government has failed to carry its burden of establishing that Sun was properly mirandized on March 14, 2019.

Although the government did not raise the argument before Judge McCarthy, it now contends that SDDO Corsi was not required to mirandize Sun because her questions fit within the "public safety" exception to *Miranda*.  (*See* Dkt. 79 at 9-12).  In *New York v. Quarles*, 467 U.S. 649 (1984), the Supreme Court established "a 'public safety' exception to the *per se* rule barring admission of statements made without *Miranda* warnings." *United States v. Reyes*, 353 F.3d 148, 152 (2d Cir. 2003).  The government contends that this "public safety" exception applies to SSDO Corsi's questions relating to the presence of anything in the home that could hurt the officers.  (Dkt. 79 at 9-12).  The government acknowledges that it failed to raise this issue before Judge McCarthy.  (*Id*. at 10).

"In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that

could have been raised before the magistrate but were not." *Gladden*, 394 F. Supp. 3d at 480 (citation omitted); *see also United States v. Hunt*, 440 F. Supp. 3d 221, 224 (W.D.N.Y. 2020) ("While the Government now tries to change course and rely on the automobile exception [to the warrant requirement], its failure to raise that argument before Judge McCarthy is fatal to its claim."). The government's failure to raise the "public safety" exception to *Miranda* before Judge McCarthy is fatal to its claim. The government had an opportunity to raise this issue before Judge McCarthy on multiple occasions, including in connection with the initial briefing on pre-trial motions, and in its post-hearing briefs. The government has not offered a satisfactory reason for failing to raise this argument, stating only that counsel was "new to the district and had not done post evidentiary hearing submissions prior to the instant case." (Dkt. 79 at 10). Accordingly, the Court overrules the government's objection in this respect on that basis alone.

However, even reaching the merits of the public safety exception, the Court is not convinced it excuses SDDO Corsi's failure to mirandize Sun. "The public safety exception to *Miranda* does not depend upon the subjective motivation of the questioning officer. Rather, it applies so long as the questioning relates to an objectively reasonable need to protect the police or the public from any immediate danger." *Newton*, 369 F.3d at 677 (alteration, citation, and quotations omitted). *Quarles* defined the public safety exception as "narrow" and explained that it "permits questions reasonably prompted by a concern for safety and in each case will be circumscribed by the exigency which justifies it." *Reyes*, 353 F.3d at 152 (quotations and citation omitted); *see also Quarles*, 467 U.S. at 658-59 (explaining that "officers can and will distinguish almost instinctively between questions

necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect"). In *United States v. Estrada*, 430 F.3d 606 (2d Cir. 2005), the Second Circuit explained that "pre-*Miranda* questions, while framed spontaneously in dangerous situations, may not be investigatory in nature or designed solely to elicit testimonial evidence from a suspect," noting that "we expressly have not condoned the pre-*Miranda* questioning of suspects as a routine matter. Rather, recognizing the need for flexibility in situations where the safety of the public and the officers are at risk, we have described the public safety exception as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of the circumstances in a given case." *Id*. at 612 (quotations and citations omitted). Accordingly, the exception has been applied in situations where an officer interrogated a suspect regarding a firearm he believed the suspect had hidden in an area near a playground and athletic fields between the time of a 911 call and his arrest, *see United States v. Ferguson*, 702 F.3d 89, 94 (2d Cir. 2012), and when officers, having received reports of the defendant's possession of a firearm and his threats to kill his mother and her husband, and the presence of others in the apartment and the reported hostility among them, questioned the defendant at the door to his apartment as to whether he had any "contraband" in the house, *see Newton*, 369 F.3d at 663-64. These cases focused on the immediacy of the threat to public or officer safety and information received by law enforcement, which "increased the probability that recovery of the gun by an accomplice or a third party would threaten the public safety." *Ferguson*, 702 F.3d at 95.

Bearing these principles in mind and examining the totality of the relevant circumstances, the Court considers whether the public safety exception excuses SDDO Corsi's failure to mirandize Sun.  The testimony at the hearing revealed that SDDO Corsi questioned Sun when they were riding in the car, and not upon entering his home.  Sun was in custody and handcuffed, and the officers did not testify they had any information relating to Sun's immediate access to firearms.  There is no indication from the hearing testimony that Sun was combative with the officers.  Sun's wife, who was on her way to the detention facility, also was not present in the home, and Sun communicated to the agents that no one else was present in the home.  Based on these facts, the government has failed to articulate any exigency justifying SDDO Corsi's failure to mirandize Sun before questioning him relating to firearms present in his home.  Rather, the government offers only that "[t]hese questions were posed to the defendant in an effort to prepare the agents for anything that might await them in the home."  (Dkt. 79 at 12).  *Cf. Estrada*, 430 F.3d at 612-13 (defendant's unmirandized statement that he had a gun in his jacket was admissible under the public safety exception, as arresting officers knew that defendant had assault convictions, that he was a well-known drug dealer and believed he had a gun in the home, and also knew that a woman was present in the apartment at the time of the arrest, all of which "contributed to and compounded the threat the officers faced, making their concern for their safety objectively reasonable"); *Reyes*, 353 F.3d at 150-51, 154 (officer's pre-*Miranda* question to defendant "if he had anything on him that could hurt the officer or anyone on the field team" was proper under public safety exception, explaining that the officers were aware, based on information provided by an informant, that the defendant

typically carried a gun, he was not yet handcuffed and could have reached for a concealed weapon, and the arrest took place in public in front of a bodega and across from a school, which created "a graphic tableau of danger to both the officers and the public" (alterations omitted)).  Accordingly, Sun's motion to suppress his statements is granted.

### III.   <u>Consent to Search</u>

The government next argues that, even if Sun was not mirandized, he gave the officers consent to search his home.  (Dkt. 79 at 13-16).  The government points to Sun's agreement at Royalton Town Court to accompany the officers to his home, so that they could obtain his wife's passport, which it argues constituted "implied consent" for the officers to enter his home.  (*See id*. at 14 ("When the defendant discussed with ICE-ERO agents going to his home to retrieve his wife's passport, he at least impliedly gave consent to the agents to search his home.")).  The government also contends that Sun consented to the search of his home by way of the handwritten consent to search form he signed at his residence.  (*Id*. ("defendant did sign a more focused, handwritten consent to search form")).  The government further argues that Judge McCarthy overlooked important facts in making his credibility determination, and that "[l]ogic dictates that the defendant lawfully provided consent."  (*Id*. at 16).  It also moves in the alternative for the Court to re-open the hearing for additional testimony to resolve any credibility determination.  (*Id*. at 17).

### A.  The Consent to Search Form

The Court turns first to the consent to search form, which was addressed by Judge McCarthy.  The consent to search form signed by Sun reads as follows: "I, Teng Sun, give my consent to enter my residence to retrieve firearms that are in my possession[.]"  (Dkt.

70 at 24-25).  SDDO Farkas testified that the consent form was drafted so that Sun could show the officers from where they could retrieve the firearms and ammunition.[4]  (*Id*. at 25).

A voluntary consent search is one of the well-recognized exceptions to the warrant requirement.  *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.").  "The government has the burden of proving consent voluntarily given by a preponderance of the evidence."  *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983).  "The ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search."  *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995) (quotation omitted).  Resolution of that question is an issue of fact based upon a totality of the circumstances, including the "age, education, [and] intelligence [of the defendant], [the] length of detention, [the] use of physical punishments or deprivations, and whether the alleged consenting person was advised of his constitutional rights[.]"  *United States v. Puglisi*, 790 F.2d 240, 243 (2d Cir. 1986); *see also Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The

---

[4]    SDDO Farkas testified that Sun showed them the firearms in the house, and that they also retrieved "several" weapons in a detached garage.  (Dkt. 70 at 13, 25-26).  However, the consent to search form signed by Sun did not specifically authorize the officers to search the garage, which was separate from his residence.  (*Id*. at 25).  *See, e.g., United States v. O'Neill*, 239 F. Supp. 3d 651, 657, 662 (W.D.N.Y. 2017) (analyzing the defendant's expectation of privacy in detached garage separate from his expectation of privacy in residence, and further noting that "the plain language of the consent form illustrates that [a third-party] did not consent to a search of the garage; he consented only to a search of the bedrooms and basement of the residence").

standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

The testimony at the hearing established that SDDO Farkas sought and obtained Sun's consent to search only after he gave unmirandized statements. Specifically, upon arriving at Sun's home, the officers took him inside, where they observed firearms paraphernalia. SDDO Farkas testified that he became "a little bit nervous" and mirandized Sun so that he could question him about being an alien out of status in possession of firearms—although, as explained above, the Court finds that SDDO's Farkas's *Miranda* warnings were not sufficient. SDDO Farkas asked Sun if he had firearms in the home, to which Sun replied in the affirmative. SDDO Farkas then sought Sun's consent to search the home for firearms.

In his post-hearing briefing, Sun argued that the search of his residence and garage was the result of unlawful police conduct and therefore must be suppressed as fruit of the poisonous tree, citing to *Wong Sun v. United States*, 371 U.S. 471 (1963), where the Supreme Court found that, under the fruit of the poisonous tree doctrine, evidence acquired directly or indirectly as a result of an illegal search or arrest should be suppressed. (Dkt. 72 at 10, 13); *see also Wong Sun*, 371 U.S. at 484-88; *United States v. Clark*, 822 F. Supp. 990, 1006 (W.D.N.Y. 1993) ("Under the fruit of the poisonous tree doctrine, evidence acquired directly or indirectly as a result of an illegal search or arrest will be excluded. However, a defendant's intervening act of free will can break the causal chain between the tainted evidence and the illegal police conduct which violates the Fourth Amendment."

(citing *Wong Sun*, 371 U.S. at 487)).  In his Report and Recommendation, Judge McCarthy

explained that it is the government's burden to prove a break in the causal chain between

an illegal confession and a subsequent search (*see* Dkt. 76 at 7; *see also United States v.*

*Ceballos*, 812 F.2d 42, 50 (2d Cir. 1987)), and because SDDO Farkas sought and obtained

Sun's consent to search only after he was illegally interrogated, the government had not

met that burden (Dkt. 76 at 7).

However, "[t]his conclusion is foreclosed . . . by the Supreme Court's decision in

*United States v. Patane*[.]"  *United States v. McCoy*, 407 F. App'x 514, 516 (2d Cir. 2010);

*see also United States v. Patane*, 542 U.S. 630, 637 (2004) (the Self-Incrimination Clause

"is a prohibition on compelling a criminal defendant to testify against himself at trial," and

"the Clause cannot be violated by the introduction of nontestimonial evidence obtained as

a result of voluntary statements").  In *McCoy*, the district court concluded that suppression

was required "because the questioning that led to the discovery of the gun and ammunition

occurred in the absence of *Miranda* warnings."  *McCoy*, 407 F. App'x at 515.  The Second

Circuit reversed, citing to the Supreme Court's decision in *Patane*:

> In *Patane,* the Supreme Court held that failure to give *Miranda* warnings
> does not require suppression of physical evidence discovered as a
> consequence of unwarned statements that are voluntary and uncoerced.  The
> Court reasoned that "the *Miranda* rule is a prophylactic employed to protect
> against violations of the Self-Incrimination Clause," which in the Court's
> view "is not implicated by the admission into evidence of the physical fruit
> of a voluntary statement."  Applying *Patane,* we conclude that the firearm
> and ammunition should not have been suppressed. . . .

*Id*. (internal citations omitted).  The court therefore concluded that the failure to give the

defendant *Miranda* warnings before he made voluntary and uncoerced statements

- 21 -

consenting to a search did not require suppression of the firearm and ammunition found during search. *Id.* at 516. *See also United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223, at *8 (S.D.N.Y. Aug. 13, 2019) (denying defendant's motion to suppress firearm, because "failure to give *Miranda* warnings does not require suppression of physical evidence discovered as a consequence of unwarned statements that are voluntary and uncoerced," and explaining that the evidence did not suggest the defendant's statements were not voluntary, as he "told law enforcement twice that he wanted to cooperate and volunteered that his firearm was on his nightstand, and [his] girlfriend led the FBI to the bedroom where the gun was located at [his] request"); *United States v. Fiseku*, No. 15 CR. 384 (PAE), 2015 WL 7871038, at *16 (S.D.N.Y. Dec. 3, 2015), *aff'd*, 906 F.3d 65 (2d Cir. 2018), and *aff'd*, 915 F.3d 863 (2d Cir. 2018) ("Although Jajaga's statement consenting to a search of the car, 'no, you can look,' is inadmissible, under settled doctrine, the physical evidence that was obtained as a result of that consent nonetheless may be received at trial."); *United States v. Solano-Fell*, No. 07-CR-6197-DGL, 2010 WL 2572950, at *2 (W.D.N.Y. May 17, 2010) ("the fact that the defendant had not been given his *Miranda* rights prior to giving his consent to search the vehicle does not impugn the voluntariness of the consent . . . absent coercion or some other illegal conduct, an otherwise voluntary consent to search can not be the 'fruit' of a custodial interrogation conducted before *Miranda* warnings are given"), *adopted*, 2010 WL 2572953 (W.D.N.Y. June 23, 2010).  In other words, the "fruit of the poisonous tree" doctrine articulated in *Wong Sun* is not applicable to physical evidence obtained following unwarned statements. *Patane*, 542 U.S. at 642 ("unlike unreasonable searches under the Fourth Amendment or actual

violations of the Due Process Clause or the Self-Incrimination Clause, there is, with respect to mere failures to warn, nothing to deter.  There is therefore no reason to apply the 'fruit of the poisonous tree' doctrine of *Wong Sun*. . . .").

Neither of the parties addressed this issue in briefing before Judge McCarthy, nor was it raised in connection with briefing before the undersigned.  As explained above, suppression of the physical evidence obtained following Sun's consent to search hinges on whether his consent to search was "voluntary and uncoerced."  Judge McCarthy did not make any findings as to that issue—rather, he found only that Sun had not been properly mirandized.  The record before the Court reveals that Sun and the officers testified to sharply conflicting versions of events relating to what occurred on March 14, 2019, including the circumstances surrounding the consent to search (*see, e.g.*, Dkt. 66 at 51 (Sun testifying that he signed the consent to search "under coercion"); Dkt. 70 at 12-13 (SDDO Farkas testifying that Sun wrote his own consent form, and he did not call Sun a liar or a terrorist, nor did he deny him his right to counsel)), and Judge McCarthy specifically declined to reach these credibility issues (Dkt. 76 at 3).  Judge McCarthy, who observed the manner and demeanor of witnesses at the evidentiary hearing, is in the best position to make such credibility findings.  Accordingly, the matter is referred back to Judge McCarthy to make proposed findings of fact, including by resolving any credibility determinations relating to the consent to search, with a recommendation as to whether Sun's consent was voluntary and uncoerced.

## B. Implied Consent

The government also argues that Sun gave "implied consent" at the Royalton Town Court for the officers to search the home for his wife's passport. Like its argument relating to the public safety exception, any argument relating to "implied consent" was not raised before Judge McCarthy.[5] Rather, the government's briefing focused on the consent to search form signed by Sun once he was in the residence with the officers. (*See* Dkt. 71). While that argument likely has been waived, *see Gladden*, 394 F. Supp. 3d at 480, as explained above, the Court requires further development of the record relating to Sun's express consent to search his home. Accordingly, the Court does not reach the government's argument relating to implied consent, or its related arguments regarding inevitable discovery or the plain view doctrine. (*See* Dkt. 79 at 22-24). These issues should be addressed, in the first instance and if necessary, by Judge McCarthy in any subsequent report and recommendation.

## IV. Sun's Right to Counsel

At oral argument, the Court raised the issue of whether the officers violated Sun's right to counsel by questioning him, and by searching his home, outside the presence of

---

[5] Later in its brief and in connection with another argument it raises, the government states that "[t]he Magistrate Judge makes no findings as to the legality of the agents' presence in the defendant's home to retrieve his wife's passport in his R&R," and that "the Magistrate Court tacitly, by its silence on the issue, found that the ICE-ERO agents were legally present in the defendant's home to retrieve his wife's passport[.]" (Dkt. 79 at 22-23). The Court disagrees with the government's characterization of Judge McCarthy's findings in the Report and Recommendation. Judge McCarthy made no finding as to whether the agents were lawfully in Sun's home to search for his wife's passport because the issue of implied consent was not raised before him, and not because he agreed that the officers were lawfully in the home.

Mr. Saraceno.   Sun raised this argument in his post-hearing briefing before Judge McCarthy, contending that the officers violated Sun's right to counsel.  (Dkt. 72 at 11-13; Dkt. 74 at 2-3).   In response, the government contends that Mr. Saraceno was not an immigration attorney and that Sun never invoked his right to counsel.  (*See* Dkt. 73 at 3-4).

The testimony at the evidentiary hearing revealed that, at the time the officers first encountered Sun at Royalton Town Court, Sun was present with Mr. Saraceno and Mr. Saraceno introduced himself to the officers as Sun's attorney.  (*See* Dkt. 66 at 38).   Mr. Saraceno testified that for purposes of interacting with the officers, he was acting as Sun's attorney, and he specifically indicated that to them.  (*Id*. at 40).   Mr. Saraceno informed Sun, in the presence of the officers, not to talk about the firearms charge or to answer any questions from the agents.  (*Id*. at 38).

As to the government's argument that Mr. Saraceno was not an immigration attorney, the government has not offered, nor has the Court found, any support for the contention that this should make any difference in the Court's analysis of Sun's right to counsel.  In other words, simply because Mr. Saraceno is not an immigration attorney would not bar him from representing Sun in an immigration matter.

Sun cites to several cases, including *Edwards v. Arizona*, *Michigan v. Jackson*, and *Arizona v. Roberson*, which he contends support his position that Sun's right to counsel was violated.  (Dkt. 72 at 12).  In *Edwards v. Arizona*, the Supreme Court held that a suspect who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him,

unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. 477, 484-85 (1981).  However, the testimony at the evidentiary hearing does not establish that Sun invoked his Fifth Amendment right to counsel.  "[A] proper invocation of the right to have an attorney present at questioning 'requir[es] a *clear* assertion of the right to counsel.'"  *United States v. Medunjanin*, 752 F.3d 576, 586 (2d Cir. 2014) (second alteration in original) (quoting *Davis v. United States*, 512 U.S. 452, 460 (1994)).  Further, "the right to counsel is personal to the individual questioned; it is a right 'that must be affirmatively invoked *by the suspect*.'  Statements by the suspect's attorney are insufficient to invoke the privilege."  *Id*. at 587 (quoting *Davis*, 512 U.S. at 461).  For example, Mr. Saraceno's statement that he was Sun's attorney is not sufficient to serve as an invocation of the right to counsel, which is personal to Sun.  *Id.* at 587 ("We reject Medunjanin's contention that the requests by [his attorney] that Medunjanin not be questioned without Gottlieb present, in calls to Agent Azad and AUSA Knox in September 2009, constituted effective invocations of Medunjanin's right to counsel.  That right was personal to Medunjanin.  Only he could waive it; only he could properly invoke it.").

In *Michigan v. Jackson*, the Supreme Court held that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid."  475 U.S. 625, 636 (1986).  However, *Jackson* was overruled by *Montejo v. Louisiana*, 556 U.S. 778 (2009), where the Supreme Court held a defendant's request for counsel at an arraignment or similar proceeding, or appointment of counsel by the court, does not give rise to the presumption that any subsequent waiver by the defendant

to police-initiated interrogation is invalid.  *Id*. at 797 ("*Michigan v. Jackson* should be and now is overruled."); *see also United States v. Paredes-Cordova*, 504 F. App'x 48, 54 (2d Cir. 2012) ("The defendant may waive the [*Miranda*] right whether or not he is already represented by counsel; the decision to waive need not itself be counseled." (quoting *Montejo*, 556 U.S. at 786)).

    *Arizona v. Roberson* extended the *Edwards* rule to cases in which the police interrogate a suspect about an offense unrelated to the subject of their initial interrogation. 486 U.S. 675 (1988).  *Roberson* involved a suspect arrested at the scene of a burglary.  *Id*. at 678.  He was mirandized and asserted his right to counsel.  *Id*.  Three days later while the defendant was still in custody pursuant to his arrest, a different officer interrogated him about a different burglary that had occurred on April 15.  *Id*.  The officer was not aware that the defendant had previously requested the assistance of counsel, and after informing the defendant of his rights, obtained an incriminating statement concerning the April 15 burglary.  *Id*.  The Supreme Court found that the statement should be suppressed, explaining that "[a]s a matter of law, the presumption raised by a suspect's request for counsel—that he considers himself unable to deal with the pressures of custodial interrogation without legal assistance—does not disappear simply because the police have approached the suspect, still in custody, still without counsel, about a separate investigation."  *Id*. at 682-83.

    The factual circumstances presented by Sun's case are different than the facts of *Roberson* because presumably both the Fifth and Sixth Amendments had attached to his charge before the Royalton Town Court, and he had counsel (Mr. Saraceno) in that case.

Sun's statements and the search on March 14, 2019, gave rise to a new charge—that is,

violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2).  "The Sixth Amendment right is

'offense specific,' meaning that even when the right to counsel attaches for one offense,

that does not mean that the defendant has a right to counsel for all ongoing criminal

investigations."  *United States v. Moore*, 670 F.3d 222, 235 (2d Cir. 2012) (alteration,

quotations, and citations omitted).  In *Texas v. Cobb*, the Supreme Court held that the Sixth

Amendment right to counsel does not extend to uncharged crimes unless they are the "same

offense" as the charged crime, and there is no exception for uncharged crimes that are

"factually related" to a charged offense.  532 U.S. 162, 168, 173 (2001).  The Court went

on to expound on how courts should determine whether the uncharged and charged crimes

are the "same offense":

> Although it is clear that the Sixth Amendment right to counsel attaches only
> to charged offenses, we have recognized in other contexts that the definition
> of an "offense" is not necessarily limited to the four corners of a charging
> instrument.  In *Blockburger v. United States,* 284 U.S. 299, 52 S. Ct. 180, 76
> L. Ed. 306 (1932), we explained that "where the same act or transaction
> constitutes a violation of two distinct statutory provisions, the test to be
> applied to determine whether there are two offenses or only one, is whether
> each provision requires proof of a fact which the other does not."  *Id.,* at 304,
> 52 S. Ct. 180.  We have since applied the *Blockburger* test to delineate the
> scope of the Fifth Amendment's Double Jeopardy Clause, which prevents
> multiple or successive prosecutions for the "same offence."  *See, e.g., Brown
> v. Ohio,* 432 U.S. 161, 164-166, 97 S. Ct. 2221, 53 L. Ed.2d 187 (1977).  We
> see no constitutional difference between the meaning of the term "offense"
> in the contexts of double jeopardy and of the right to counsel.  Accordingly,
> we hold that when the Sixth Amendment right to counsel attaches, it does
> encompass offenses that, even if not formally charged, would be considered
> the same offense under the *Blockburger* test.

*Id*. at 172-73.  In other words, the question would be whether the Royalton charge and the

federal charge are the "same offense" under *Blockburger* and, if they are the same offense,

whether Sun waived his right to counsel on March 14, 2019 or whether counsel should have been present during the search of his home on March 14, 2019.

It is not entirely clear to the Court whether Sun advances his right to counsel argument pursuant to the Fifth Amendment or the Sixth Amendment. As the government agreed at oral argument, a valid waiver of the Fifth Amendment right to counsel would have to occur following *Miranda* warnings, and therefore any argument advanced by the government that Sun knowingly and voluntarily waived his Fifth Amendment right to counsel would seem to be foreclosed by the Court's conclusion that he was not properly mirandized. Because the parties have not addressed many of the issues raised by Sun's right to counsel argument, it may be that further briefing on this issue is necessary. However, because the Court has concluded that the case must be referred back to Judge McCarthy for further findings relating to Sun's consent to search, and because Judge McCarthy's recommendation and the Court's subsequent decision on that issue may resolve Sun's suppression motion, the Court will not address the right to counsel issue at this juncture. This issue should be addressed, in the first instance and if necessary, by Judge McCarthy in any subsequent report and recommendation.

## CONCLUSION

For the foregoing reasons, the Court adopts Judge McCarthy's Report and Recommendation in part and refers the matter to Judge McCarthy for further proceedings, consistent with this Decision and Order.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:        November 22, 2021
              Rochester, New York

- 30 -